IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 9, 2013

**IN RE BRANDON J. G. ET AL.**

**Appeal from the Chancery Court for Lawrence County**
**No. 12-15993      Robert L. Holloway, Judge**

**No. M2013-01832-COA-R3-PT - Filed February 25, 2014**

The mother of six children and the father of one of the children appeal the termination of their parental rights. The juvenile court terminated the mother's parental rights on three grounds, substantial noncompliance with the permanency plans, persistence of conditions, and willful abandonment by incarceration, and upon the determination that termination of her parental rights was in the best interests of the children. The court terminated the father's parental rights on the grounds of substantial noncompliance with the permanency plans, willful abandonment by failure to support and failure to visit, and the determination that termination was in the best interest of the child. Mother and father appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the appellant, Crystal C.[1]

William J. Eledge, Lawrenceburg, Tennessee, for the appellant, Christopher D.

Robert E. Cooper, Jr., Attorney General and Reporter, Ryan L. McGehee, Assistant Attorney General, S. Craig Moore, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

Crystal C. ("Mother") is the mother of the six children involved in this appeal: Brandon (born September 2000); Rachel (born August 2001); Michael (born August 2003); Allison (born July 2004); Alyssa (born April 2006); and Joshua (born September 2009). Each child has a different father, but only Christopher D. ("Chris D."), the father of Rachel, is involved in this appeal.[2] Thus, we will limit our analysis to these two parents.

Mother has an extensive criminal record and, as she described it, has been on probation her "whole life" for one criminal act or another. In December 2003, Mother pled guilty to misdemeanor child abuse. Mother and the children went to a department store and the children were reportedly dirty and not wearing shoes or coats. Mother was seen striking Brandon, three years old at the time, and was treating the children in an abusive manner. From 2008 to 2010, Mother entered guilty pleas for various crimes including, passing worthless checks, forgeries, fraudulent use of credit card, misappropriation of rental property, possession of marijuana, Class C felony theft of property for stealing a rental car, and felony vandalism for damages to the stolen rental car. The ultimate result of these guilty pleas was a sentence of eight years to be served on community corrections.[3]

Mother also has a history of drug abuse and admitted to being addicted to opiates, shooting morphine, smoking marijuana, and going on cocaine binges. Mother stated she would melt morphine tablets and shoot them with a syringe while at her parents' home, where she and the children lived. In 2007, Mother was admitted into the New Life Lodge, an alcohol and drug treatment center located in Burns, Tennessee, for a 21 to 28 day program; however, she was administratively discharged (told to leave) six days into her stay for offering drugs to other patients.

As Mother explained her romantic relationships, she "liked to get in abusive relationships with men" and "was a glutton for punishment." In 2000, Mother married Chris D., father of Rachel. Mother and Chris D. divorced in 2010; however, before her divorce she married James B. in 2002, father of Michael. After divorcing James B., Mother married

[2]Scott W.G. is the father of Brandon (born September 2000); Christopher D. is the father of Rachel (born August 2001); James B. is the father of Michael (born August 2003); Scott A. is the father of Allison (born July 2004); Bruce B. is the Father of Alyssa (born April 2006); and the father of Joshua (born September 2009) is unknown.

[3]The Tennessee Community Corrections Act of 1985 was enacted to provide an alternative means of punishment for "selected, nonviolent felony offenders in front-end community based alternatives to incarceration," and "thereby reserving secure confinement facilities for violent felony offenders." *State v. McNack*, 356 S.W.3d 906, 909 (Tenn. 2011) (internal citations omitted).

Bruce B., father of Alyssa. In 2003, Mother testified that she had no relationship with Scott A., father of Allison, other than that she met him on the internet and "got drunk and . . . pregnant." Mother testified that she does not know who Joshua's father is. Currently, Mother is married to Brandon C., whom she married in 2009. At the time of trial, Mr. C. was incarcerated after pleading guilty to domestic assault.

The Department of Children's Services ("the Department") has been involved with Mother and members of her family since the birth of her first child in 1999, when Mother was 16 years of age.[4] The Department's first involvement with any of the six children at issue here was in 2005 when the children were first removed from Mother's custody. This event stemmed from charges that she allowed a registered sex offender to live with her and the children. Mother followed the steps and requirements of the permanency plan and the children were returned to her custody.

On June 28, 2011, the Department was called to the home of David and Mary H., Mother's parents ("the Grandparents"), where Mother and the children had been living; Mother's oldest son, Matthew, whom the Grandparents had previously adopted, also lived in the home. The home was infested with roaches, unsafe, unkempt, and unsanitary. Following an investigation, the children were removed from the home due to the conditions of the home and concerns for the children's welfare. The Juvenile Court of Lawrence County found the children dependent and neglected, pursuant to Tennessee Code Annotated 37-1-102(b) and granted custody to the Department, where they have remained since their removal on June 28, 2011.[5]

On August 29, 2012, the Department filed a petition to terminate the parental rights of Mother and Chris D. Mother was serving an eight year sentence in the Lawrence County Jail during the termination hearing which took place on June 18 and 19, 2013. Mother and Chris D. were each represented by counsel; however, Father did not attend the hearing.

The juvenile court entered an Order Terminating Parental Rights of Mother and Chris D. on July 12, 2013. With regard to Mother, the court found the Department had proven three grounds by clear and convincing evidence, the grounds of: substantial noncompliance with

---

[4]Mother became pregnant with her first child, Matthew, in March 1999. A referral was made to the Department that Mother had removed the infant "from a moving vehicle" and "threatened to drop him on his head if her demands were not met." In April 1999, a Protective Custody Order was entered and the infant was placed with the Department. On September 28, 1999, custody was granted to the maternal grandparents of the child and Mother's parental rights were terminated. The grandparents later adopted Matthew.

[5]Matthew was also removed from the Grandparents' home; however, the Grandparents regained custody when they complied with the permanency plan and Matthew is not at issue in this appeal.

the permanency plan, persistence of conditions, and abandonment due to Mother's incarceration and wanton disregard for the welfare of the children. In regard to Chris D., the court found the Department had proven by clear and convincing evidence the grounds of: substantial noncompliance with the permanency plan and abandonment due to failure to visit and failure to support. Further, the court found termination of Mother and Chris D.'s parental rights was in the best interests of the children. Accordingly, their parental rights were terminated.

Mother and Chris D. filed a timely appeal. Mother presents the following issues for our review: whether the trial court erred in finding three grounds for termination of her parental rights under Tennessee Code Annotated § 36-1-113, and whether termination of her parental rights is in the best interests of the children.

Chris D. presents four issues for our review: whether the trial court committed reversible error by failing to grant a continuance on the trial in order for Chris D.'s court appointed counsel to locate his client; whether the trial court erred in finding two grounds for termination of his parental rights under Tennessee Code Annotated § 36-1-113; and whether termination of his parental rights is in the best interests of the children. We will first address the denial of his motion for a continuance.

**ANALYSIS**

I. DENIAL OF CHRIS D.'S MOTION FOR CONTINUANCE

Chris D. insists the trial court erred in denying his motion for a continuance made at the start of the parental rights terminal trial on June 17, 2013. "The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997) (citations omitted).

Chris D. and his home address could not be located by the Department or his counsel during the trial. Chris D. does not challenge the adequacy of the notice of service by publication or the diligent efforts of the Department to locate him. At the start of the first day of trial, June 17, 2013, Chris D.'s counsel made a motion for a continuance to have more time to contact his client. The court denied the motion noting that the proceedings had been filed on August 29, 2012, roughly ten months before.

The record indicates Chris D. *voluntarily* ceased communication with the Department and did not provide an address when he moved to Alabama. Reviewing the record in its

entirely, it defies logic to assume that if more time had been provided to counsel to locate Chris D., that it would have made any difference in the outcome of the case. Consequently, Chris D. has failed to demonstrate that the court abused its discretion in denying the motion for continuance or that he was prejudiced by the denial. *See, e.g., Commissioner of the Dept. of Transp. v. Hall*, 635 S.W.2d 110 (Tenn.1982).

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). The petitioner has the burden of proving that one statutory ground for termination exists. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). In addition to proving one ground for termination, the petitioner must prove that termination of parental rights is in the child(ren)'s best interest(s). Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proven by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546.

Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T. et al.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

III. PERMANENCY PLAN AND THE DEPARTMENT'S EFFORTS

"Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home."[6] *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). The Department's first obligation in this regard is to establish permanency plans, the terms of which are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This statutory policy does not require that the Department's effort to reunify the family be "herculean"; nevertheless, the Department's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

---

[6]Tenn. Code Ann. § 37-1-166(g)(4)(C) excuses reasonable efforts "if a court of competent jurisdiction has determined that . . . [t]he parental rights of the parent to a sibling or half-sibling have been terminated *involuntarily*." (Emphasis added). In April 1999, a Protective Custody Order was entered and Matthew, Mother's first child, was placed with the Department. On September 28, 1999, custody was granted to the maternal grandparents of the child and Mother's parental rights were terminated. The record before us, however, does not state whether Mother's parental rights were terminated *involuntarily*, as required by Tennessee Code Annotated § 37-1-166(g)(4)(C), and Mother, who was then 16, may have *voluntarily* surrendered her parental rights to Matthew. Therefore, the facts of this case do not excuse the Department from exerting reasonable efforts to reunify the family. Accordingly, we must first determine whether the terms and goals of the permanency plan were reasonable and related to remedying the conditions which necessitated removal of the children and whether the Department exerted reasonable efforts to assist Mother and Chris D. to achieve the goals and to be reunited with their children before examining the grounds at issue.

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *S.M.D.*, 200 S.W.3d at 198.

## A. PERMANENCY PLAN

The children were removed from the Mother's custody due to the conditions in the Grandparents' home in which she and the children were living. Sherry Allen, a Child Protective Services Assessor for the Department, testified that the condition of the home was "deplorable" with boarded up windows, holes in the walls, a large hole in the bathroom floor, a roach infestation throughout the home, piles of clothes and toys in bedrooms, cat and dog food scattered on the floors, and hypodermic needles were found in the bathroom. The children's medication was unlabeled and kept in a tackle box. Mother testified the medication was "not in kid order," but she knew "which medicines to grab." Upon further investigation by the Department, it was discovered that Mother had missed over twenty-five doctor's appointments for the children. Mother was arrested due to charges related to the conditions of the home.

Because of the above concerns, the Department developed a permanency plan on July 25, 2011, with the desired outcome of Mother and/or fathers to be able to supply appropriate, safe, and stable housing on a consistent basis and to be able to properly balance any and all dental, education, medical, and mental health appointments consistently so the children's needs are properly met.

We have concluded the above requirements and goals identified in the permanency plans were reasonable and related to remedying the conditions which necessitated the removal of the children from Mother's care and the resulting foster care placement. Accordingly, the plans satisfied the requisite criteria. *See In re Valentine*, 79 S.W.3d at 547; *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C).

## B. REASONABLE EFFORTS

Since the Department first became involved in 1999, there have been approximately twenty-five investigations due to numerous allegations of abuse and neglect. Ms. Allen testified about the many services the Department provided to the family, including, mental

health services, medication therapy and in-home case management services through Life Care Family Services; intensive in-home services through Youth Villages, and in-home monitoring services provided through the Department. The family would make some progress when services were provided; however, when the Department was no longer involved the situation deteriorated.

The Department also attempted to provide similar services to Chris D. Lori Bartlett, a family services worker for the Department, testified that when Chris D. was released from jail, the Department provided assistance in obtaining housing and parenting services, including, paying his first month's rent for a home in Lawrenceburg.

Considering the above facts and other relevant evidence we have not yet addressed, we have determined the Department exerted reasonable efforts to assist Mother and Chris D. to achieve the stated goals.

We now turn our attention to the statutory grounds at issue: substantial noncompliance with the permanency plans, persistence of conditions, and abandonment, to determine whether the evidence clearly and convincingly establishes one or more of these grounds.

### IV. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

#### A. SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLAN

The juvenile court found that both Mother and Chris D. were in substantial noncompliance with the permanency plan. Noncompliance with the permanency plan is a statutory ground for termination of a parent's rights. Tenn. Code Ann. § 36-1-113(g)(2). For noncompliance to justify the termination of parental rights, it must be "substantial" noncompliance. *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 546.

The first permanency plan was established on July 25, 2011. Pursuant to the first and subsequent plans, the goals of which remained consistent, Mother and all fathers were to, inter alia, resolve their legal issues, submit to random drug screens, obtain and maintain suitable housing, maintain legal means for financial support, and all fathers were to become more involved as parents with their child by attending supervised visits and/or appointments concerning their particular child.

Kim Jennings, a family service worker for the Department, testified that Mother's demeanor during meetings was "threatening," to Ms. Jennings, other Department workers, supervisors, or "whoever happened to be in the room." Ms. Jennings described Mother's therapeutic visitations with the children as "chaotic," with the children running around and fighting, while Mother and the Grandparents would "just be sitting there." Ms. Jennings also discussed a visit in which candy, soda, and boxes of Little Debbie cakes were made available to the children, including Michael, who has diabetes.

Lori Bartlett, a family services worker for the Department, also described a therapeutic visit as "chaotic" and "horrible." Ms. Bartlett testified that Mother became upset at the presence of an African American worker for Omni Vision, and began to express her beliefs in "white supremacy" and the "KKK." During this same visit, one of the children broke a plastic ring by accidently stepping on it; Mother yelled at the child and told him that he "intentionally" broke the ring. Ms. Bartlett testified that Mother's reaction toward the child was inappropriate. Ms. Bartlett ended the visit after arguments in front of the children between Mother and the grandmother.

In August 2011, shortly after signing the first permanency plan, Mother incurred new criminal charges including, inter alia, domestic assault resulting from an altercation while she and the children were living with Roger H. and his two children. Mother moved in with Mr. H. after the children were removed by the Department. Mother testified that she was angry because Mr. H. found her morphine pills and syringes and disposed of them. During the assault with Mr. H., Mother said Mr. H.'s son got hit. Numerous drugs were found in the home, along with a syringe on the floor and broken glass, to which Mr. H.'s children had access. Along with domestic assault, Mother was also charged with possession of drug paraphernalia, possession of Lortab without a prescription, and possession of over a half gram of melted morphine found inside a spoon with burn marks on the bottom.

On October 13, 2011, as a result of these charges, Mother was revoked on the eight year community corrections sentence and her eight year prison sentence stemming from her 2010 convictions was reinstated.

Ms. Bartlett also provided testimony regarding Chris D., stating that during 2011 and 2012, he paid de minimis amounts in child support to the Department on behalf of Mother and he paid no child support on behalf of his child, Rachel. A home trial visit motion was filed with the juvenile court in March of 2012; however, the visit never occurred, due to Chris D.'s failure to correct the faulty electrical wiring in the home he resided in at that time. Brooke Hall, an employee of Omni Vision, offered to make her office available for visits or make other arrangements to allow for visitation. Chris D. stated he would contact Ms. Hall, but he never did. His last visit with Rachel occurred on May 17, 2012, and shortly thereafter,

he moved to Alabama, without providing an address, and ceased contact with the Department.

The foregoing, and other evidence in the record, clearly and convincingly establish Mother and Chris D. were in substantial noncompliance with the permanency plans. Therefore, we affirm the trial court's finding that the parents failed to substantially comply with the requirements of the permanency plan.

## B. ABANDONMENT

### 1. Mother's Abandonment by Incarceration

The juvenile court found that Mother abandoned her children under the definition of abandonment in Tennessee Code Annotated § 36-1-102(1)(A)(iv):

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

The fact that a parent is incarcerated or recently incarcerated during the action or proceeding, is not in and of itself a ground for the termination of parental rights. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005).

> An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*Id.*

The record is replete with details of Mother's extensive history of criminal behavior; offenses which include, inter alia, misdemeanor child abuse and allowing a sex offender to live with her children. Mother has abused numerous drugs, including opiates, morphine, marijuana, and cocaine. Mother neglected the medical care of her children, including, missing approximately sixteen doctor's appointments for her children and thirteen appointments at Vanderbilt to treat her child with Type 1 Diabetes.

Mother was serving an eight year community corrections sentence at the time the children were removed from the home. Mother knew the permanency plan required her to resolve all legal issues; however, she incurred additional charges for domestic assault, vandalism, and possession of drugs and drug paraphernalia on August 27, 2011, leading to revocation of her community corrections sentence.

We have reviewed the record and find the evidence clearly and convincingly supports the conclusion that Mother abandoned here children under the definition of abandonment in Tennessee Code Annotated § 36-1-102(1)(A)(iv). The record reveals Mother has been incarcerated since August 2011. The Department filed a petition to terminate the parental rights on August 29, 2012; thus, Mother was incarcerated "all or part of the four months immediately preceding the institution of such action or proceeding," satisfying the first test of the statute. Tenn. Code Ann. § 36-1-102(1)(A)(iv). Further, based upon the foregoing and the record in its entirety, we find Mother's pre-incarceration conduct clearly and convincingly displayed a "wanton disregard for the welfare" of her six children. Mother knew that violating the terms of the community corrections program would result in going to prison, but testified that the "drugs got the better" of her.

We, therefore, affirm the trial court's ruling that Mother abandoned her children as defined in Tennessee Code Annotated § 36-1-102(1)(A)(iv).

### 2. Chris D.'s Abandonment by Failing to Visit

Tennessee Code Annotated § 36-1-113(g)(1) provides that parental rights may be terminated based upon the ground of abandonment for willfully failing to visit the child. This form of abandonment is defined as when a parent "willfully failed to visit . . . the child for the period of four consecutive months preceding the filing of the petition to terminate that parent's rights." Tenn. Code Ann. § 36-1-102(1)(A)(i).

Failure to visit a child is "willful" when a parent is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). However, where the failure to visit is *not* willful, a failure to visit a child for four months does not constitute

abandonment. *R.G.W. v. S.M.*, No. M2009-01153-COA-R3-PT, 2009 WL 4801686, at *8 (Tenn. Ct. App. Dec.14, 2009) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "A parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *Id.*

Tennessee Code Annotated § 36-1-102(1)(E) states, "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." "[T]oken visitation," is visitation, which "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

Chris D.'s last visit with his child, Rachel, was on May 17, 2012, which was within the four month period preceding the Department filing the petition to terminate his rights. After Chris D.'s last visit with Rachel, he moved to Alabama without providing an address and refused to cooperate with the Department. Further, Chris D. made no attempts to visit Rachel or contact the Department after his last visit, and he did not participate in the trial.

We have reviewed the record and although Chris D.'s last visit falls within the preceding four months of the Department's petition to terminate his parental rights, we find the evidence clearly and convincingly supports the conclusion that Chris D. only engaged in token visitation during the relevant period and the visitation did not produce a meaningful visit to establish a meaningful relationship or bond between the parent and the child. Thus, he willfully failed to visit the child for the determinative four months. See Tenn. Code Ann. § 36-1-102(1)(C) and (E).

We, therefore, affirm the trial court's ruling that Chris D. abandoned the child by failing to visit the child as defined in Tennessee Code Annotated § 36-1-102(1)(A)(i).

## C. Additional Grounds for Termination

We have affirmed two grounds for the termination of Mother's parental rights, substantial noncompliance with the permanency plan and abandonment due to incarceration, and two grounds for the termination of Chris D's parental rights, substantial noncompliance with the permanency plan and abandonment by failing to visit. Parental rights may be terminated if (1) the existence of at least *one statutory ground* is proven by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 809; *In re Valentine*, 79 S.W.3d at 546. Because the Department has proven more grounds than are required to terminate both parents' respective

rights, it is not necessary that we analyze the remaining grounds. Nevertheless, we have examined the record and find the evidence clearly and convincingly supports the trial court's conclusion that the conditions which led to the removal of the children from Mother would, in all reasonable probability, continue to exist or reoccur upon Mother's release from prison and, in all reasonable probability, would cause the children to be subjected to further abuse or neglect. Further, there is little or no likelihood for the safe return of the children to the care of Mother and the continuation of Mother's relationship with the children would greatly diminish each child's chances of early integration in to a safe, stable, and permanent home. Thus, we affirm the finding that the Department proved the ground of persistence of conditions.

As for the finding that Chris D. abandoned his child by failing to pay child support, we have concluded that the evidence is not sufficient to establish, by the requisite clear and convincing standard, that he willfully failed to pay support at the applicable time.[7]

## V. BEST INTERESTS OF THE CHILDREN

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interests analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

Ms. Bartlett provided testimony concerning the children and their current foster placement. The children were placed in different foster homes based upon their different needs.

Allison, Alyssa, and Joshua reside in the same pre-adoptive foster home, and Ms. Bartlett stated the children's behavior has improved since their placement. The foster parent,

---

[7]"A parent's failure to support is "willful" if (1) the parent is aware of his duty to support, (2) has the capacity to provide the support, (3) makes no attempt to provide support, and (4) has no justifiable excuse for not providing the support." *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008).

Denise L., has a large support system which includes her church, where she is the director of children's ministry, and her mother and father, who live down the street from her.

Michael was placed in the foster home of Shawn and Michelle A. In March 2012, he was admitted into a pediatric psychiatric hospital due to significant behaviors, specifically, screaming fits that would last up to four hours. These behaviors were prevalent from the beginning of his placement and he would have periods of improvement, however, they would always reoccur. Although Michael has been removed from their home, Mr. and Mrs. A. developed a significant bond with him. The foster parents often visit him on the weekends and bring the family dog because it makes Michael happy. The goal is to return Michael to their home and adopt him.

Brandon is staying in the pre-adoptive foster home of Jeff and Patricia R., which is located on a horse farm. Ms. R. testified that Brandon was initially petrified of animals, the dark, being alone, or even shutting the door to the bathroom or closing the shower curtain. Since his placement in their home, Brandon now loves the animals and communicates better with his foster parents and peers. Brandon is active in the family's church, horse shows, and goes camping with his foster parents. Ms. R. testified that they love Brandon and want to adopt him.

Rachel is staying in a pre-adoptive foster home with several children, including a daughter of the foster family that is her age. Ms. Bartlett testified that Rachel's interaction with her foster parents is positive and she has bonded with them. Rachel also testified that the foster parents treat her well and she gets along with the other children in the home, and it would be "good" if they adopted her.

The record shows that since the children have been removed from the home, they have each thrived in their foster homes and Michael is receiving needed care in a pediatric psychiatric hospital. Allowing the children to return to the parents would subject the children to more uncertainty and instability. Moreover, it would require the removal of the children from environments where their conditions have dramatically improved and they are much happier and healthier. Tenn. Code Ann. § 36-1-113(i)(5).

Considering these relevant factors from the children's perspective, the evidence clearly and convincingly established it is in the children's best interests that Mother and Chris D.'s parental rights be terminated.

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, Mother and Christopher D., jointly and separately.

_____
FRANK G. CLEMENT, JR., JUDGE